Chief Justice Marshall
delivered the opinion of the Court.
James Alves, claiming to own and to have been for more than twenty years in possession of the land between the Ohio river and Water street, (reduced,) in the town of Henderson, except the cross streets running to the river, filed his bill in 1850, to enjoin Vanzant from continuing to excavate and remove the earth on a portion of that land near the river, .which he claimed to be doing under the authority of the trustees, who having been brought before the court by Vanzant, made their answer a cross bill against the complainant, asserted the right of the town in the entire slip between the river and the lots fronting on Water street, under an ordinance of Richard Hen *160 derson and company, establishing the town according to a plat, which showed that said slip was dedicated to the use of the town and the public, and calling upon the complainant to exhibit his title, they pray that the title of the town may be quieted, &c.
Alves, in his answer to the cross-bill, relies upon various deeds purporting to convey to him different interests derived from some of the original members of the company of Richard Henderson and company, to which company the Legislature of Virginia, by an act of' 1778, to be found in 3d Littell’s Laws of Kentucky, 585,. had granted, by the name of Richard Henderson and company and their heirs as tenants in common, and without further designation of the grantees, two hundred thousand acres of land on the Ohio, which included what was originally called “the Red Banks,” afterwards known as th.e town of Henderson, and situated on the Ohio river in the present county of Henderson. And he relies especially upon a deed of 1825, purporting to be made by the citizens and lot-holders of the town of Henderson, and to convey to himself and others, whose interest in the slip of land in contest were afterwards conveyed to him, besides certain portions of the public square, all their right, title, and interest in and to Water street, reduced to one hundred and twenty-five feet, which description seems to have been intended to embrace the entire river front between Water street reduced and the river. This deed was in fact executed by a minority of the holders or owners of lots at its date, and by a part only of the citizens. It purports to be made in consideration of certain rights relinquished by Amelia Alves, the heirs of Walter Alves, (of whom James Alves was one,) and Richard G. Hart, as made by a deed between these parties and the citizens of the town of the same date. Which deed, last referred to, conveys the right, title, and interest of the grantors in certain designated lots and in the streets, except the part between the river and Water street reduced, to the citizens of the *161 town, and states its consideration to be the relinquishment by the citizens as evidenced by the deed from them. And the complainant alleges that these deeds were made in compromise of a claim set up by him and others under Richard Henderson & Co.; that the arrangement was made with the consent and approbation of all the citizens, and was moreover ratified by an act of the Legislature in 1827; that all ought to be bound by it, and that should it be disregarded in behalf of the town, great injustice will be done to the adverse claimants, and especially to himself, as their claim is now barred by the statute of limitations, and they cannot be placed in statu quo. He shows subsequent conveyances to himself from Amelia Alves and the heirs of Walter Alves and others. He relies also upon his alleged possession ever since 1825, upon leases, transfers, and other acts of dominion on his part, on his continued payment of taxes for it to the town, and on the recognition of his title by the trustees, in fixing the amount of taxes to be charged therefor. James Alves having died, the original and cross-bills were revived by and against his executors and heirs.
Upon the hearing, a decree was rendered dissolving the injunction which Alves had obtained, and forever quieting the trustees of the town of Henderson, so far as the executors and heirs of Alves are concerned, in the possession, use, and enjoyment of the territory between Front or Water street of said town and the Ohio river, to be held by them as a public common, highway, and landing for the use and benefit of the citizens of said town. And the case is brought to this court by the representatives of Alves.
It appears that as early as June, 1797, Gen. Samuel Hopkins, as the agent, and Thomas Allen, as the surveyor, of Richard Henderson & Co., laid off the town of Henderson, and made a plat of it, exhibiting and defining the lots, streets, and alleys, a large open space as a public square, and the space between *162 the river and the lots fronting towards it entirely open without mark or division; which plat, with the ordinance now to be noticed, was recorded in the Henderson county court. In August of the year 1797, James Hogg and John Williams, two of the original members, and others, claiming to represent other members, met at Williamsborough, North Carolina, and passed an ordinance entitled, “ordinance of the Transylvania company, commonly called Richard Henderson and company, directing the disposal of the town of Henderson and the out lots.” The first sentence is as follows : “Be it resolved and ordained, that the town of Henderson and all the land, lots, streets, apportionments, and appointments thereof, lying on the Ohio river, in the county of Christian, (as it then was,) and state of Kentucky, as laid off and surveyed by our agent, Samuel Hopkins, and our surveyor, Thomas Allen, agreeable to the plat or form by them made, and to us returned with their certificate, be and the same is hereby established.”
The ordinance then goes on to describe more particularly the manner in which the town had been laid off, to give and grant all the lands located in said plats for the purposes of the town, and to prescribe the manner and terms of disposing of lots by the agent, directing donations in some circumstances, also prescribing forfeitures for failure to improve, &c., and reciting the probable advantage to the lands generally from the speedy settlement of the town. It also makes formal provisions with respect to the responsibility of their agent, that he shall submit his books annually to the inspection of commissioners, who have power to remove him for cause; that he shall sell and convey the lots, collect the proceeds, and pay them over in proper proportions to the several persons entitled, or their private agents, &c., &c. And it continues the agency of Samuel Hopkins, with the powers above stated. The conclusion of the instrument is, “in testimony whereof, we the aforesaid company have hereunto set our hands and *163 seals this 9th day of August, 1797.” Then follow the names and seals of nine persons, the original number of the company, of which names four are identical with the names of original grantees, owning originally four-eighths of the entire grant; and one other is the name of Walter Alves, the father of the complainant James, through whom he derives a considerable part of his interest, from John Williams, James Hogg, and Thomas Hart, whose names, (that of Thomas Hart by attorney,) are all signed to the ordinance. The fourth name identical with that of an original grantee entitled to one-eighth of the grant, is that of Nathaniel Hart. The identity of name in connection with lapse of time, and the notorious acts done under the ordinance, would authorize the assumption that Nathaniel Hart, the party to the ordinance, was the original grantee of the same name. There is no fact or suggestion in the case to the contrary, unless it be the statement of James Alves in his answer, that only three of the original company were alive at the date of the ordinance. And unless the fact known to one member of the court to have been proved in another case, having no connection with this and not referred in it, that Nathaniel Hart died in 1782, is to operate in this case, it must be presumed that Nathaniel Hart, one of the original grantees, was also a party to the ordinance. But be this as it may, the lapse of time and the nature of the acts done under the ordinance, not only justified the assumption, after the lapse of twenty years, and before 1825, that the ordinance and the signatures thereunto were the genuine acts of those who appear parties to it, but then also authorized the presumption that those who adopted and signed it in the name of the company were either themselves the company, or were authorized to act for it. And it would devolve upon those who deny its efficacy as to themselves, to make out in proof the ground of impeachment. It is to be observed that the act of 1778 making the grant, does not name the individual *164 grantees, but grants the two hundred thousand acres of land to Richard Henderson & Co., and their heirs as tenants in common, thus apparently making or treating them as a quasi corporation, so long at least as the original grantees survived and the land remained in common. What regulations the original grantees constituting Richard Henderson & Co., may have made for determining and evidencing the will of the company with respect to its common interests, and for exercising dominion over the common property, this record does not show. But it is to be presumed that an act so important and so formal as this ordinance, adopted in the name of the company, and signed and sealed in such a manner as to bind the interests of the actual parties to it, and of such others as they had a right to bind, and to which several of the original grantees were parties, was in fact, as it purports to be, the act of the company, and as such binding upon all its members.
As to all persons interested in the grant at the date of the ordinance, and who were then sui juris, and who had acquiesced in it, this presumption must have prevailed prima facie in 1825, and has now become almost irresistible. And even if a feme covert or infant were then entitled as heirs of'an original grantee, we are not satisfied that such an interest left by the ancestor, involved with the larger interests of a company of which he was member, and to whose acts his own interests were subj eet, should not also be bound by the acts of the company done in proper form for the common advantage, and of which the infant or feme covert may have, in common with others, the full benefit.
Independently of the mere value of the land on which a town is established, its settlement and growth necessarily enhance the value of the adjacent lands, and those who receive the benefit of this exhancement, to the full value of their interests in the land covered by the town, established' by their co-tenants on a minute portion of the eommon land, *165 have little right in conscience, (though they may not have been divested of their title,) if they repudiate the authority by which the town was established, to claim at the same time the land within it, or its value enhanced by the act which they repudiate. If they concede the legality and efficacy of the establishment of the town, they must also concede the lights vested in it and its inhabitants, and they will be entitled of course to their just proportion of the proceeds of sales in the town. Even in the case of mere private interests held by tenants in common of undivided land, if one co-tenant appi'opriates to himself a specific portion by occupation and improvement, or by sale and conveyance, such an appropriation will be so far protected in equity, that if there be enough of the other common lands to satisfy the just claim of the other co-tenants according to the original condition and value of the whole uneffected by the labor of the co-tenant who has made the appropriation, they will be thus satisfied, and the appropriation made by one, though at first without an exclusive right, will not be disturbed, unless it be necessaiy for effecting a just and equal partition. And neither femes covert nor infants are exempt from the application of this principle of equity.
I. Where one of several tenants in common aliens part of the land the purchaser will not be disturbed in his possession, if the other claimants can be satisfied as to their interest out of the remainder.
1. If, therefos’e, Mrs. A. Alves, represented to have been the daughter and sole lieii’ess of William Johnston, an original grantee, owning one-eighth part of the grant to Richard Henderson & Co., was, at the date of the ordinance, the wife of Walter Alves, who was a party to the ordinance, and signed and sealed it, either in virtue of her interest, or of that and others acquired by him; and if, not being bound by it, she repudiated it after her husband’s death, still, as the ordinance is in fact an appropriation of the land included in the town of Henderson, by those who made it, first to themselves, or the uses appointed by them, and then to the purchasers of lots and the inhabitants of the town, and the public, there is still greater reason than in an ordinary case, to say that *166 she had no right to disturb the appropriation of the-land included in the town established by her co-tenants, and held and improved by numerous individuals under them, unless it were necessary for the satisfaction of her just and equal interest in the common land, irrespective of the peculiar value of the land in the town, consequent upon its appropriation as a town. And it is only upon this condition that the Chancellor would, in 1825, have aided her in the assertion of a right inconsistent with the validity of the ordinance, or with the rights acquired under it.
But it is not proved in this case, as we understand the record, that Amelia Alves was, at the date of the ordinance, either an infant or a married woman; nor does it appear that her full interest in the grant might not, in 1825, have been satisfied in other portions of the grant, nor that it had not been so satisfied, nor that she had not received her just proportion of the proceeds of the sale of lots, or compensation for her portion received by her husband, Walter Alves, who had extensive interests in the grant; nor in fact is it shown that she ever repudiated, or attempted to repudiate, the ordinance, or to deny the authority under which the town, with its public grounds, was established and sold and conveyed and built up, or that she asserted any interest in opposition to it, except as it may be inferred from her execution of the deed conveying to the citizens all her right, title, and interest in certain lots, perhaps all of which had been sold in consideration of' a deed executed by the citizens, her acceptance of which implies an acknowlment on her part of their right in the land therein mentioned, and of the validity of the ordinance, and of the establishment of the town, under which alone they pretended to have any interest.
In a bill filed by Walter Alves in 1817, claiming from Samuel Hopkins an account and payment of money, the proceeds of the sale of lots in Henderson, the interest of Mrs. Alves, in whose right the claim is in part made, is stated as being one-sixteenth *167 —that is, one-half of the eighth held originally by her father, William Johnston. Walter Alves also claimed, in his own right, portions of the interests of John Williams, James Hogg, and Thomas Hart, all of whom, as well as himself, were parties to the ordinance, and thereby conclusively bound their interests into whosoever hands they might afterwards come. Two thousand dollars were paid by Hopkins to the order of Walter Alves, during the progress of this suit, which was afterwards discontinued. It is the interests of these parties, derived principally through Walter Alves, and all by acts subsequent to the date of the ordinance, that James Alves and others conveyed, or attempted to convey, to the citizens, who, or the town, already had a better title to them than he had to the interests of Williams, Hogg, Thomas Hart, and Walter Alves. Richard G. Hart, who was also a grantor in the deed of 1825 to the citizens, and a grantee in their deed, was a co-complainant with Walter Alves in the bill of 1817, and claimed for himself and co-heirs, whom he professed to represent, the interest of their father, Nathaniel Hart, an original grantee, entitled to one-eighth. The bill contains a full recognition of the validity of the ordinance, and the agency of Hopkins, and corrobarates, as to Richard G. Hart, the presumptions before mentioned. He afterwards conveyed his interest in the river front to James Alves, as did also Wm. Hart, claiming to be an heir of David Hart, an original grantee of the Henderson grant, entitled to one-sixteenth. He too was a party to the bill of 1817. In 1840 James Alves also procured a conveyance of the interest of Burton, residuary legatee of John Williams in the entire grant. These deeds recite small considerations, and in fact passed nothing in the town, except such interest, if any, as Richard G. Hart acquired in the space between the river and Water street reduced, under the deed of the citizens.
Did any right, title, or interest pass by the deed of 1825, purporting to be from the citizens and lot-hold *168 ers of the town of Henderson? What right had they in the public square, and in the space between Water street reduced and the river? With regard to the public square we need not pursue the inquiry farther than to say, that whether anything passed by the deed or not, the portions of it claimed under the deed having probably been suitable for private appropriations, may be presumed, after a lapse of twenty-five or thirty years, to have been taken possession of, and so appropriated to the exclusive use of individuals claiming under the deed as to have acquired a title against the town, by length of possession. There being no proof to the contrary, it may be presumed that the grantees in the deed from the citizens have in this way realized, under color of that deed, property of considerable value.
2. A portion of the grantees of the company to whom the grant waa made, called Henderson’s grant, (see 3 Littell’s Laws of Kentucky, p. 585,) by an ordinance, set apart a portion of the grant for the town of Henderson, by a plan set forth in a plat, in which public grounds, streets, alleys, were laid down: held, that the public grounds, streets, alleys, and the space between the lots and the 0-hio, were dedicated to public use.
*168 With regard to the land between the river and Water street, the dedication of which to the use of the town and the public, so far as those who established the town, or ratified that act, could do it, is so manifest that we have not stopped, and shall not now stop, to demonstrate it. The right of the citizens and lot-owners was a mere right to use and keep it open as a common or highway, or as it is described in the deeds of 1825, a street, for access to the river, and for all the public purposes to which such a space between the lots and a navigable river, running along the front of the town, could be appropriately used by the citizens of the town, and the general public, so far as any person or persons might have occasion so to use it. And as the property of the town, it was under the general control and superintendence of the trustees, for its preservation and improvement, and for wharfage, and other appropriate profits, for the benefit of the town.
It was decided in Buckner vs. Trustees of Augusta, 1 A. K. Marshall, 9, that trustees of a town had no right to alien or convey such property, from the uses to which it was dedicated. And the same doctrine has been held ever since, and has been repeatedly *169 recognized by this court. Of course the action of the trustees upon the valuation of this property for taxes charged to Alves, did not conclude the town as to the title ; and especially when Alves claimed that the estimates should be low, because his title was disputed. We think it very clear that a conveyance from a portion, and, as we are inclined to think, even from all of the citizens, must be equally inoperative. It is as public property that the citizens of the town, and all others, have the right to use such property. The right of individuals in it is a mere right to use it, in subordination to the public right. This right of use belongs equally not only to lot-holders but to all inhabitants, and to all individuals of the State, according to their various necessities or convenience; and it is a right which belongs to future as well as to present lot-holders and inhabitants. If one citizen or lot-holder should attempt to convey his individual right to another, it is difficult to conceive that his own right to the use would be diminished; and even if, by estoppel or otherwise, it should be extinguished, we do not perceive that this could operate to enlarge the right of the grantee, who had already as much right in the proper uses of the street or common as he can have or enjoy, and as every other citizen also had. And if it were admitted that all the inhabitants could, by their joint deed, destroy or extinguish the public right, which we do not admit, it seems to be evident that a conveyance, by any number less than the whole, could not affect the rights of those who did not convey, and could not change the nature or the character of the property, which would still remain dedicated to the common and public use of all others, if not of those who made the deed; whence it follows that a conveyance, or attempted conveyance, of this right, by any portion, would not enlarge the rights or interest of the grantee; and when it is considered that the right of use pertains to the larger public, outside of the town, and to all persons in it, without regard to age or sex, or disabil-' *170 ity, there seems to be no way of extinguishing this common right, by the act of individual citizens, while the town itself remains. We are satisfied, therefore, that the deed of 1825, executed by a minority of the lot-holders, and by a part only of the citizens, passed nothing to the grantees, and invested them with no rights in addition to those which they before had. And as the act of the Legislature of January, 1827 — Session Acts, 50 — ratifies the arrangement, of which this deed was a part, so far only as it affected the interest of the parties to it, the deed, however efficacious it may have been made as between the parties, is even, under the operation of the statute, wholly ineffectual as to other parties; and as all who were not parties have precisely the same rights which they would have had if the deed had not been made, for no one derives from the makers of the deed the right to use the streets and public grounds of the town, it follows, that even under the operation of the act, if it be operative at all, the grantees acquired no right to use the public grounds to the exclusion of other individuals, or of the public. Even if the act be effectual to reduce the width of Water street to 125 feet, it does not, in so doing, profess to revoke the dedication, nor was it competent for the Legislature to do so, since that would have been taking away the property of the town and its citizens.
3. It is not competent for the citizens of a town, by deed, to transfer to an individual the title to, or. exclusive use of, the streets, alleys, and public grounds dedicated to the use of the public.
It is however contended, that although the deed was not executed by all it was, in fact, approved by all the citizens; that all derived the benefit of the arrangement and compromise, of which it was a part; and that from lapse of time, and general acquiescence of the citizens in the claim and possession of James Alves, under the compromise and deed of the citizens, it should be presumed that they admitted and assented to his title, and to the legislative act by which it was confirmed. But if it be doubtful as to the effect of a deed executed by all of the male adults of the town, it seems entirely certain *171 that mere acquiescence in the deed which could affect only the rights of the parties to-it, and purported nothing more, could not give to it a more extensive operation. The same remark applies to the act of the Legislature, which, besides reducing Water street, which might only distinguish it from the residue of the common property, ratified the arrangement or compromise so far only as it affected the rights of the parties to it. There is, however, no evidence that this act was passed on the general application of the town, or that at its date,- or any time since, either its existence or its terms were known to all or a majority of the inhabitants ; nor is there any evidence of universal acquiescence in the claim or possession of Alves, or of such possession on his part as excluded the public from the actual use of all portions of the land now in contest, and as might, by a continuance for twenty years, defeat the public right and perfect his own.
4. A citize"'of a town, b? enclosing an® holding ad versely for twenty years, may acquire exclusive right to a portion of the public grounds dedicated to public use, but the possession and use must be adverse and the use exclusive.
It is true that since about the year 1828, James Alves having acquired from the claimants under the deed of the citizens, or most of them, their interest in the slip between Water street reduced and the river, has either occupied or leased or sold, under claim to the whole, certain defined portions of it. Before the commencement of this claim however, and during the entire period since, the town, its inhabitants, its municipal authorities, and the public generally, according to their necessities and occasions, have made the appropriate use, and exercised the appropriate acts of ownership over all accessible public portions of the same slip or river front which were not, at the time, in the adverse possession of Alves, or those claiming under him, by exclusive occupancy, or by actual inclosure, by which the public or common use was actually excluded. With the exceptions thus indicated the inhabitants and others have, at all times, used this space at pleasure, not only for common access to the river, but by digging and hauling away sand from the banks, by loading and un *172 loading boats at any part of the shore, by using it for building and launching boats, and by collecting, under the authority of the town, wharfage from boats landing and lying at any place on the shore from the upper to the lower end of the town. And with the exceptions before made there has been no difference in the manner and extent of these uses, before and since the arrangement of 1825, unless it be that the charge of wharfage had not previously been made. This being the appi’opriate uses by which the public right to the space in question, as being dedicated to the use of the town and the public, for a street or common, would be properly asserted and maintained, we think it is entirely clear that the public right could not be ousted by a mere claim of title or possession, or by anything less than an actual private occupancy or exclusive use, evidenced by inclosure, and that it could not be defeated except by a continued adverse occupancy, or exclusive jjossession thus evidenced during twenty years before the assertion of the public right by suit or action. To this extent only is it understood that in the case of Rowan’s ex’ors. vs. Portland, 8 B. Monroe, 259, the public right was held to be barred by an adverse possession of twenty years. Applying this test in the present case we are satisfied, from a careful examination of the testimony, that although there may be certain portions of land between the river and Water street reduced, of which there has been such a possession as bars the public, and although some of them may have been held under claim derived from Jas. Alves, there was not, at the commencement of this suit, in October, 1850, or at the time of filing the answer of James Alves to the cross-bill of the trustees, in L852, any part of the disputed land then in the possession of himself or his tenants, by inclosure or actual occupation, which had been so in possession, continually, for twenty years preceding either of these dates. The owners or claimants of any portions of the land of which there may have been an exclusive posses *173 slon at the commencement of this litigation, not be-mg before the court, or parties to this suit, except James Alves, and his representatives since his death, the interests of no others are affected by the decree, which, under the views expressed in this opinion, is deemed correct;
On the whole case it appears, that of the interests set up by Alves and other claimants in 1825, all were either bound by the ordinance, and the acts done under it, or barred by time, unless the doubtful interest of Mrs. Amelia Alves be an exception.— Doubtless the assertion of a large claim by Alves and others, against the town, just when the citizens, to get clear of the harassment and unfavorable influences of a litigation, in which they had been involved by another claimant, had agreed to quiet his claim by a compensation in money, produced an alarm for their interests and those of the town, under which many of them, for the sake of peace, and to avoid a litigation which, in any event, would retard the growth of the town, were willing, without much investigation, to purchase quiet and repose by the alienation of portions of the public property. If they had not the power to do this, and if, as we have decided, their deed was ineffectual for the purpose, it has not been made manifest in this case that they obtained much advantage by the conveyance of Alves and others to the citizens. At any rate, before it could be assumed that the nullity or the nullification of the deed from one party to the compromise, operated as a great hardship upon the other, because he cannot now be placed in statu quo, it should be shown that something substantial passed from that party in the compromise, and that no fair compensation has been received for it under color, and by the conceded operation of the void deed. But nothing of this appears. It is not shown that even Amelia Alves had any claim available against the town, or that she intended to assert any byr litigation, or that there would, in fact, have been any litigation upon *174 the claims involved in the compromise. Nor is it shown that nothing considerable has been realized under the deed from the citizens, or that what has been claimed under it can be restored.
Wherefore, the decree is affirmed.